1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALBERT H. WANG,<br><br>                                    Plaintiff,<br><br>vs.<br><br>COMMUNITY HEALTH SERVICES, INC., FALLBROOK HOSPITAL CORPORATION; CYNTHIA ANN KLINE-BARNETT; PRIMARY CRITICAL CARE MEDICAL GROUP INC.; BRUCE TIMOTHY GIPE; MIRIAM ROSE DUNN; and KRISTIN R. BUTLER,<br><br>                                    Defendants. | CASE NO. 06CV1478-LAB (POR)<br><br>**ORDER**<br><br>**(1) GRANTING DEFENDANTS' MOTIONS TO DISMISS;**<br><br>**(2) DENYING AS MOOT DEFENDANTS' ANTI-SLAPP MOTIONS; AND**<br><br>**(3) DENYING AS MOOT MOTIONS TO STRIKE PUNITIVE DAMAGES**<br><br>[Dkt Nos. 57, 58, 59, 60, 61] |

Plaintiff Albert H. Wang ("Wang") is proceeding *pro se* with a First Amended Complaint ("FAC") arising from his approximately 15-minute visit to the Fallbrook Hospital emergency room. He names as defendants three for-profit health care providers and four of their personnel (collectively "Defendants"): Community Health Systems, Inc. ("CHS"); Fallbrook Hospital Corporation ("Fallbrook"), whose parent company is CHS; Dr. Cynthia Ann Kline-Barnett, M.D. ("Kline-Barnett"), a physician and surgeon working in the Fallbrook Emergency Department; Primary Critical Care Medical Group, Inc. ("PCCMG"), alleged to be Kline-Barnett's employer and the operator/manager of the Emergency Department at Fallbrook; Dr. Bruce Gipe, M.D. ("Gipe"), medical director of the Fallbrook Emergency Department and President and Medical Director of PCCMG; Miriam Dunn, R.N. ("Dunn"),

a nurse employed by Fallbrook; and Kristin Butler, R.N. ("Butler"), a nurse employed by Fallbrook.  Wang characterizes his case as one of "patient dumping"[1] due to Defendants' purportedly stereotypical presumptions about his economic status and ability to pay for emergency medical services.

Wang alleges seven causes of action:  (1) Battery; (2) Assault; (3) False Imprisonment; (4) Public Disclosure of Private Facts; (5) Violation of Constitutional Right of Privacy; (6) Violation of California's Unruh Civil Rights Act; and (7) Medical Negligence.  He seeks compensatory damages against all Defendants in the amount of $2,000,000.00, punitive damages against Kline-Barnett, Fallbrook, and CHS in the amount of at least $8,000,000.00, and reasonable attorneys' fees and costs.[2]

Defendants are divided into two separately-represented groups:  Fallbrook Hospital, CHS, Dunn, and Butler (collectively "Fallbrook Defendants"); and PCCMG, Kline-Barnett, and Gipe (collectively "PCCMG Defendants").  Each group moved to dismiss or strike the original Complaint.  While those fully-briefed Motions were under submission, Wang filed a First Amended Complaint("FAC"), resulting in the court's denial of the pending motions as moot.  Each group of Defendants now renews its motions or joinders:  to dismiss the FAC for failure to state a claim (FED. R. CIV. P.  ("Rule") 12(b)(6)); to strike the FAC pursuant to California's anti-SLAPP statute (CAL. CODE CIV. P.  § 425.16); and to strike the punitive damages claim pursuant to Rule 12(f) and CAL. CODE CIV. P.  § 425.13.  Pursuant to Civil Local Rule 7.1(d)(1), the court finds the issues presented appropriate for decision on the papers and without oral argument.  For the reasons discussed below, the motions to dismiss are **GRANTED**, and the other motions are consequently **DENIED AS MOOT**.

---

[1]  "The act of patient dumping occurs when patients presenting in the emergency department are **denied emergency medical care of *stabilizing treatment*** based on economic or non-economic grounds, such as the patient's race, ethnicity, sexual orientation, or contraction of a socially unacceptable disease . . . ."  FAC ¶ 321 (emphasis added).

[2]  Wang is proceeding *pro se* in this action, although he alleges:  "Plaintiff is a member in good standing of the New York State Bar association," and is "a corporate partner at a reputable law firm."  FAC ¶¶ 385-386.  Wang cites no authority to support his entitlement to any attorneys' fee award, were he to prevail on the merits.  Attorneys representing themselves in litigation are ordinarily not entitled to attorneys' fees.  Mix v. Tumanjan Dev. Corp., 102 Cal.App.4th 1318, 1322-24 (2002).

1    I.      FACTUAL ALLEGATIONS AND BACKGROUND

2         A "complainant can plead himself out of court by pleading facts that undermine the

3    allegations set forth in [the] complaint." Henderson v. Sheahan, 196 F.3d 839, 846 (7th Cir.

4    1999).  Wang's elaborate FAC illustrates why less can be more.

5         In his 84-page First Amended Complaint ("FAC"), Wang alleges that mid-afternoon

6    on July 30, 2005, he suffered a medical emergency at his Fallbrook home associated with

7    his consumption of wine.  His wife called paramedics when it appeared Wang had briefly lost

8    consciousness.   The paramedics  treated  Wang for  a few  minutes  at his house.   They

9    suggested his symptoms could indicate he had experienced transient ischemic attack

10   ("TIA"), acute cerebrovascular disease ("CVA"), and altered level of consciousness.[3]

11   Wang's wife, a medical doctor, instructed the paramedics to transport Wang by ambulance

12   to Fallbrook Hospital for examination.

13        Wang alleges he arrived at Fallbrook at about 3:45 p.m., was the only patient in the

14   emergency room, and remained there less than 20 minutes.  At the time of his admission,

15   he was wearing a plain T-shirt and shorts.  FAC ¶ 62.  He had not brought any personal

16   effects in the ambulance with him, including his insurance cards, credit cards, or other

17   identification.  Wang speculates:  "As a result, Fallbrook Hospital's personnel thought that

18   Plaintiff was indigent, did not have medical insurance, and could not afford to pay for

19   Fallbrook Hospital's services."  FAC ¶ 56.  However, he states no fact from which it could be

20   inferred Defendants actually harbored any such thought, particularly as he also alleges his

21   wife followed him to the hospital, arriving within minutes of his admission, bringing with her

22   his insurance and identification papers.

23        Wang alleges Defendant Kline-Barnett, "the emergency physician working in

24   Fallbrook Hospital's emergency room, dumped Plaintiff, a patient under her care, and

25   promptly called the police to arrest Plaintiff, without any warrant, from the emergency room."

26   _____

27        [3]   Wang alleges those observations appear in the paramedics' Pre-Hospital Care Report.
28   Although Wang's FAC alludes to and characterizes a number of documents (e.g., inter alia,
     Physician's Documentation, Nurse's Documentation, Health Service Incident report, Sheriff's
     Department Summaries), none is provided as an  Exhibit to the FAC.

1  FAC ¶¶ 50-53, 63-64.  He attributes that conduct to Defendants' profit motive:  "Keeping
2  Plaintiff in the hospital for 24 to 48 hours close observation would be expensive,  The
3  medical bill would be uncollectible if Plaintiff were an indigent, uninsured patient." FAC ¶ 65.

4      Police arrived in the emergency room "at about 3:56 p.m."  FAC ¶¶ 90-92.  Wang
5  contends he was "mentally awake, alert and oriented" at the time.  He alleges a medical
6  record was made that he "was in mild distress and appeared moderately anxious" but
7  without "evidence of delusional thinking or homicidal or suicidal thought, processes or
8  behavior." FAC ¶ 97.  He alleges Nurse Documentation shows he repeatedly demanded his
9  rights as a U.S. citizen, and Kline-Barnett noted in her Physician Documentation he "wants
10  to speak to his lawyer."  Wang characterizes those notations as substantiating that at all
11  times he "behaved lawfully and properly invoked his patient rights as well as his civil rights."
12  FAC ¶¶ 94-97.  He argues he posed no threat to anyone, as allegedly documented in a
13  California Department of Health Services' Incident Investigation Report and in a San Diego
14  County Sheriff's Department summary of factual circumstance.

15      Although he contends he "was peaceful and did not cause any physical injury or
16  threaten anyone's safety," Wang acknowledges the Sheriff's Department's description of the
17  arrest records Wang appeared to be "under the influence and '*acting in an argumentative*
18  *manner with hospital staff*.' "  FAC ¶¶ 99-101 (emphasis in FAC).  Wang purports to quote
19  from written observations by one of the responding police officers, Jeffrey Schmidt.  That
20  officer noted Wang started out as "*verbally argumentative"* with hospital staff, but became
21  "*more and more vocal*, and began moving his arms around as the staff tried to treat him."
22  FAC ¶ 102 (emphasis in FAC).  The police arrested Wang pursuant to CAL. PENAL CODE §
23  647(f).  That code section establishes as a misdemeanor "disorderly conduct" by persons
24  "found in any public place under the influence of intoxicating liquor . . . ."

25      Wang contends Defendants violated Fallbrook's internal security policies and
26  procedures by calling the police instead of the hospital's own Security Department for
27  "dealing with a confrontational and/or combative patient." FAC ¶¶ 136-142.  He disputes
28  there was any need to call police "because" there were in the emergency room at the time

"at least one doctor, two nurses, a few other hospital employees, and two paramedics," as well as Wang's wife.  He argues Defendants' "outrageous conduct . . . resulted in a deprivation of Plaintiff's liberty and caused him severe emotional distress."  FAC ¶¶ 143-145. He summarizes the result as false arrest "because of patient dumping."  FAC ¶ 148.

Wang characterizes his interactions with hospital staff as "legitimate requests [for] full disclosure about any proposed treatment," whereas Kline-Barnett instead "wrongfully called the police to have Plaintiff arrested and sent him to jail like a common criminal," thus exposing him "to the risk of impending stroke."  FAC ¶¶ 122-123.  Despite his acknowledged resistence, he faults Defendants for not performing certain diagnostic protocols for a patient who presented with his symptoms and paramedic assessments, and imputes a motive that it would have been "expensive," and "[m]ost of the uninsured patients cannot financially afford to pay for such hospital services."  FAC ¶¶ 69-70.  He alleges in particular Kline-Barnett was "grossly negligent" in spending just 15 minutes performing a medical examination when he was suspected of having a TIA and acute CVA.  He enumerates eight examples of her alleged failings, including the absence of any "physician orders or treatments documented in the medical record."  He criticizes her for failing to check a box on a Medical Evaluation form provided by the responding officers indicating it was medically safe for police to detain or incarcerate him.  FAC ¶¶ 78-79,109-118.

Wang further alleges Kine-Barnett failed "to look into possible medical complications that may arise from his high blood cholesterol level and the cholesterol-lowering medication he was taking" -- without alleging she had any such information  -- and relies on his wife's opinion "he should at least have [had] a CT scan of his brain to make sure that Plaintiff's temporary loss of consciousness was not triggered by any ruptured blood vessel in his brain."  FAC ¶ 80.  On that basis, he alleges Kline-Barnett "unreasonably exposed Plaintiff to risk of impending stroke," although "he did not subsequently have a fatal stroke. . . or suffer permanent paralysis. . . ."FAC ¶¶ 81.  He  alleges *no* medical detriment traceable to Defendants' conduct, but summarily argues Defendants "unnecessarily exposed [him] to greater harm and unjustly left him in much worse state."  FAC ¶ 82.

1    Wang characterizes the alleged failure to perform a thorough examination to

2    determine *whether* he had an emergency medical condition as resulting in his discharge

3    from the emergency room before he was stabilized ("i.e., before he has been provided the

4    necessary medical treatment to assure, within reasonable medical probability, that no

5    material deterioration of his condition is likely to result from, or occur during, his transfer from

6    Fallbrook Hospital").   FAC ¶ 202.   However, he alleges no fact related to his physical

7    condition that suggests he was not physically stable at that time, or that he was experiencing

8    any acute symptom whatsoever, particularly given his descriptions of himself as "aware,

9    alert, and oriented."  He alludes to no physical complaint whatsoever, nor has he alleged any

10   physical deterioration or medical complication attributable to his release from the emergency

11   room.  He nevertheless alleges the absence of "necessary medical treatment" violated the

12   federal Emergency Medical Treatment And Active Labor Act ("EMTALA"),[4] violated federal

13   regulations which expand the definition of "emergency medical condition" to include

14   symptoms of substance abuse, and violated CAL. HEALTH & SAFETY CODE §§ 1317, *et seq.,*

15   among other things.  FAC ¶¶ 195-203.

16   Wang alleges numerous infractions of internal hospital policies and   Fallbrook's

17   promotional materials, various professional codes of conduct, and similar guidelines

18   promising "considerate, respectful, and appropriate healthcare," explanations of treatment

19

20   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

21       [4]  Under federal standards applicable to emergency departments, an "emergency medical
     condition" is defined as meaning "a medical condition manifesting itself by acute symptoms of
22   sufficient severity (including severe pain) such that the absence of immediate medical attention could
     reasonably be expected to result in . . . placing the health of the individual . . . in serious jeopardy,
23   . . . serious impairment to bodily function, or . . . serious dysfunction of any bodily organ or part."  42
     U.S.C. § 1395dd(e)(1)(A), Emergency Medical Treatment And Active Labor Act ("EMTALA").  The
24   EMTALA was enacted in 1986 as part of the Comprehensive Omnibus Budget Reconciliation Act of
     1986 ("COBRA"). That COBRA provision "provides that hospitals that have entered into Medicare
25   provider agreements are prohibited from inappropriately transferring or refusing to provide medical
     care to 'any individual' with an emergency medical condition."  Barris v. County of Los Angeles, 20
26   cal.4th 101, 109 (1999), *citing* 42 U.S.C. § 1395dd.  The Barris court sets out the elements of an
     EMTALA claim for failure to stabilize, none of which is satisfied by Wang's pleading.  Id. at 110.  The
27   basis for such a claim is necessarily "professional negligence," differing from state medical
     malpractice claims "principally because it also requires *actual knowledge* by the hospital that the
28   patient is suffering from an emergency medical condition and because it mandates only stabilizing
     treatment."  Id.; *see* CAL. CIV. CODE § 3333.2.  That failure must also be the proximate cause of
     personal injury or wrongful death.  Id. at 112.

or procedures, patient rights to make decisions about the healthcare received, and the like.[5] FAC ¶¶150-153.  He invokes numerous state statutory and regulatory schemes aimed at preserving the privacy of patient medical records, such as the Privacy Rule of California's Health Insurance Portability And Accountability Act of 1996 ("HIPAA"), the Joint Commission on Accreditation of Health Organizations ("JCAHO"), and Fallbrook's HIPPA Notice Of Privacy Practices, allegedly offended by Defendants' calling police and purportedly releasing confidential patient and health information to law enforcement officials without his written permission.  FAC ¶¶  155,158-162, 164-166, 204-212.  Wang relies on Officer Schmidt's purported statement in the Arrest Report to substantiate his confidentiality violation allegations:  "I contacted hospital staff, **who informed me Albert Wang was transported via ambulance to the hospital as a result of severe alcohol intoxication**."  FAC ¶ 167 (emphasis added).  He contends the release of that information also constitutes a violation of the Comprehensive Alcohol Abuse And Alcoholism Prevention, Treatment And Rehabilitation Act Of 1970, 42 U.S.C. § 290dd-3.[6]  FAC ¶¶ 174-177.

Wang contends HIPAA privacy regulations and ethics code violations occurred not only when hospital medical personnel disclosed to police that he was in the emergency room (FAC ¶ 168), but also when they permitted police officers to enter the emergency room and to remain there "to make first-hand observations about [his] medical conditions and the

---

[5]  Wang's attribution of actionable wrongdoing based on Defendants' *ab initio* call to outside law enforcement personnel rather than to the hospital's own internal security officer(s) -- as Wang alleges Defendants' internal procedures require -- does not create a cause of action.  Violations of private entities' policies may provide evidence of some wrongdoing in some circumstances, but in and of themselves, they are not the source of any cognizable legal theory of recovery.  Even Wang refers to them as "guidelines" or "polices" only.

[6]  The dubious validity of Wang's sweeping inventory of statutory schemes (most irrelevant to his actual causes of action) is illustrated by his invocation of the  Federal Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment, and Rehabilitation Act of 1970, 42 U.S.C. 290dd-3. He alleges not a single fact to establish his standing as a person covered by the Act. Although the court does not reach the merits of any of Wang's claims in deciding the Rule 12(b)(6) Motions, his citation to that Act is particularly far-fetched.  The FAC supports no inference Wang had any contact with these Defendants at any time other than for 15-minutes in the Fallbrook Hospital emergency room on July 30, 2005.  As Wang himself describes it, the Act restricts access to the records "of the identity, diagnosis, prognosis or treatment of any patient which are maintained in connection with the performance of any program or activity relating to alcoholism or alcohol abuse education, training, treatment, rehabilitation or research."  Anti-SLAPP Mot. Opp. 6:1-9.  His allusion to that Act is merely cumulative of his admission of drunkenness at the time of his arrest.

06CV1478

1   medical attention being given" (FAC ¶ 169). *See also* FAC ¶¶ 178-185, 190-194. He

2   disputes the Fallbrook Emergency Department is a "public place." *See* FAC § 361. He

3   argues the officers should have been told to stay in the waiting room or reception area,

4   because "[m]ost patients would find police officers' presence in the emergency room as

5   offensive, unreasonable, and an unnecessary intrusion of their privacy," as well as stressful,

6   causing patients to react in a "defensive, irritated or agitated" manner (FAC ¶¶ 171-172),

7   inferring their presence had that effect on him. He extrapolates from those allegations a

8   generalization that "*[u]nwarranted* law enforcement activities by police officers in hospitals

9   have a chilling effect on *racial minorities'* willingness to seek needed medical help for fear

10  of government intrusion into *private citizen's* life." FAC ¶ 173 (emphasis added).

11      Wang is also unhappy with the Defendants' delay in investigating and responding to

12  his reported grievance. FAC ¶¶ 396-416. He complains neither CHS nor Fallbrook Hospital

13  has sanctioned anyone over the incident, in purported contravention of the CHS Code of

14  Conduct regarding disciplinary action, and even though the California Department of Health

15  Services purportedly "clearly indicated that Fallbrook Hospital's doctor and nurses violated

16  the Hospital's policies and procedures on Saturday, July 30, 2005." FAC ¶¶ 418, 417-423.

17      Wang further alleges "[n]otwithstanding the fact that its emergency department

18  personnel did not render any valuable medical services to Plaintiff, and in fact exposed him

19  to greater harm, Fallbrook Hospital sent Plaintiff's insurance company a medical bill for

20  $1,407.80 purportedly for a Level-4 emergency department visit,"[7] a "grossly excessive"

21  amount because he purportedly was not provided with Level-4 emergency room care, and

22  the care he did receive was "substandard" during the 15 minutes he was there. FAC ¶¶ 126,

23  216-222. He also characterizes the billing as Defendants' attempt to conceal their purported

24  misconduct in the manner of hist treatment. FAC 216-222; *see also* FAC ¶¶ 230, 233-34.

25  Purportedly to hide the fact the bill was excessive, Wang alleges Fallbrook falsely reported

26  _____

27      [7]   Wang brings no separate claim for billing misconduct. He simply argues the bill was
        excessive given that medical personnel ordered no diagnostic tests. FAC ¶ 132. He alleges he
28      disputed the validity of the medical bill (FAC ¶¶ 127-128), and contends he never signed any
        authorization (FAC ¶¶ 129-130).

to his insurer he had been diagnosed with "open wound, unspecified site" with "the external cause of injury [as] an unarmed fight or brawl." FAC ¶¶ 224-226. He denies any such *"pre-admission"* fight, wound, or physical injury, and on that basis characterizes the claim as "fraudulent." FAC ¶¶ 227, 235. However, *he admits he left the hospital with an injury*: "**The open wound and the other physical injuries *suffered by Plaintiff* were caused by Defendants and would not have happened if Plaintiff did not go to Fallbrook Hospital on Saturday, July 30, 2005." FAC ¶ 228 (emphasis added). The FAC does not elaborate the cause, location, nature, or particular actor associated with his physical injury.

Supposedly relying on public records he obtained from the San Diego County Sheriff's Department, Wang provides detailed statistics, descriptions, allegations, suppositions, inferences, and argument to sweepingly allege Defendants purportedly continue to violate patients' privacy rights and have a practice of "unnecessarily call[ing] the police on its patients." FAC ¶¶ 236-306. Even if such opinion were relevant to his claims, he infers the untenable presumptions all such incidents involve "unwarranted" law enforcement intervention and disclosure of confidential patient information. Rank speculation, far afield of the essential elements of his causes of action, does not satisfy his obligation to plead adequate facts pertinent to his particular case to save the action from dismissal for failure to state a claim.[8] Wang's speculations culminate in the legal conclusion he allegedly encountered "selective patient dumping due to discriminatory preconception about plaintiff's financial ability to pay." FAC ¶¶ 305-313, 314-318, 367, 366-375.

Wang repeatedly alleges, in various iterations, he received "unequal, substandard treatment at Fallbrook Hospital because the hospital personnel discriminated against him based on his physical appearance, and thought that Plaintiff could not financially afford their medical services and dumping him as a patient was '*the most expedient thing to do.'*

---

[8]  Wang attributes a purported "trend toward the reduction in the number of law enforcement incidents at Fallbrook Hospital after the inception of Plaintiff's requests for such public records" as documenting "a strong correlation between the number of law enforcement incidents at Fallbrook Hospital and the number of Plaintiff's requests under California Public Records Act ('CPRA')," purportedly "suggest[ing] that Plaintiff's CPRA information requests do have a beneficial deterrent effect on the crime rate at Fallbrook Hospital and/or the number of times Fallbrook Hospital calls the police in the absence of any crime." FAC ¶ 309.

1   Discrimination was a substantial factor leading to his false arrest." FAC ¶ 320.  He

2   speculates: "Had Fallbrook Hospital known that Plaintiff had medical insurance and had the

3   financial ability to pay for medical services, they would have considered Plaintiff a '*preferred',*

4   *'desirable'* patient, and kept him in the hospital, as an inpatient, and give [*sic*] all the medical

5   attention he was wil[l]ing, able and ready to pay for. . . ." [9]  FAC ¶ 329. "[I]f, at the time he

6   was admitted to the emergency room, Plaintiff had his wallet with him, and showed them his

7   insurance ID card and credit cards . . . [h]e would not have become the victim of a '*glitch in*

8   *the system'* at Fallbrook Hospital had they thought that he was the right patient that will help

9   them to increase their revenue." Id.  That extravagant conjecture contradicts Wang's

10  assertion his wife arrived at the hospital shortly after him with his identification and proof of

11  insurance, as well as his allegations of racially-motivated discrimination.

12      Wang's allegations of racial discrimination are completely undermined by his

13  characterizations associated with his economic discrimination allegations. Moreover, his

14  racial discrimination conclusions are unsupported by even a single fact specific to this

15  incident that could remotely support such an inference.  The details of his "physical

16  appearance" allegations relate to the manner in which he was dressed and his speculation

17  imputing to Defendants economic reasons for their alleged decision to "dump" him based

18  on a perceived inability to pay, whereas had they known he could pay for treatment,

19  Defendants would have considered him a "preferred" and "desirable" patient irrespective of

20  his ethnicity. FAC ¶329. Nevertheless, he repackages his economic discrimination claims

21  to argue:  "Plaintiff was singled out by Fallbrook Hospital for discriminatory treatment

22  **because of his national original [*sic*] and ethnicity (i.e., Chinese American), which led**

23  **them to erroneously assume that Plaintiff did not have medical insurance and did not**

24  **have the financial ability to pay** for their medical services." FAC ¶ 362 (emphasis added);

25  *see also* FAC ¶ 173. Rather than cast his racial discrimination allegations as a potentially

26  _____

27      [9]  "At the time Plaintiff was admitted to Fallbrook Hospital, Plaintiff was just wearing a plain
    T-shirt and a short.  Plaintiff was not wearing his Swiss Army watch or Cornell Law School class ring.
    Plaintiff was not carrying with him his DKNY wallet which contains his United Healthcare insurance
28  card, credit cards, and other identification cards. [¶]  As a result, Fallbrook Hospital's personnel
    thought that Plaintiff was indigent. . . ." FAC ¶¶ 55-56.

1   actionable refusal of service or rights due to his ethnicity, Wang argues he was "a victim of

2   the stereotypical view that Asian Americans are 'model minorities' who do not likely to [*sic*]

3   complain about unequal treatments, and that as a member of the Asian American 'model

4   minorities,' Plaintiff was likely to simply remain silent even though he was given less attention

5   that [*sic*] he needed and his civil rights infringed."  FAC ¶ 330.  "Fallbrook Hospital's

6   personnel simply thought that Plaintiff was just another 'silent minority' and not likely to

7   actually take actions to protect his civil rights, and that infringing his rights would have no

8   consequence to them whatsoever."  FAC ¶ 332.

9       Wang describes at length the nature and extent of his injuries arising from the

10  hospital incident, all of them psychological or emotional in nature:  embarrassment, loss of

11  dignity, anger, inconvenience, emotional distress, trauma, and inability to put the incident

12  behind him, all adversely affecting his personal and professional life.  FAC ¶¶ 382-395.

13      Defendants' Motions To Dismiss the FAC assert failure to state a claim under any of

14  the seven causes of action Wang alleges and absolute privilege and immunity from suit.

15  **II.    DISCUSSION**

16      **A.    <u>Motions To Dismiss For Failure To State A Claim</u>**

17          **1.    <u>Legal Standards</u>**

18      A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint.  <u>Navarro v.</u>

19  <u>Block</u>, 250 F.3d 729, 732 (9th Cir. 2001).  Rule 8(a)(2) requires only "a short and plain

20  statement of the claim showing that the pleader is entitled to relief," in order to "give the

21  defendant fair notice of what the . . . claim is and the grounds upon which it rests."  <u>Bell</u>

22  <u>Atlantic Corp. v. Twombly</u>, -- U.S. --, 127 S.Ct. 1955, 1964 (May 21, 2007), *quoting* <u>Conley</u>

23  <u>v. Gibson</u>, 355 U.S. 41, 47 (1957).

24          While a complaint attacked by a Rule 12(b)(6) motion to dismiss
            does not need detailed factual allegations; . . . a plaintiff's
25          obligation to provide "grounds" of his "entitle[ment] to relief"
            requires more than labels and conclusions, and a formulaic
26          recitation of the elements of a cause of action will not do. . . .
            Factual allegations must be enough to raise a right to relief
27          above the speculative level . . . .

28  <u>Bell Atlantic</u>, 127 S.Ct. at 1964-65 (citations omitted).

1   "[S]ome threshold of plausibility must be crossed at the outset" before a case is

2   permitted to proceed.  Bell Atlantic, 127 S.Ct. at 1966 (citation omitted), *abrogating the*

3   *formulation in* Conley, 355 U.S. at 45-46 ("Dismissal of a claim under this Rule is appropriate

4   only where 'it appears beyond doubt that the plaintiff can prove no set of facts in support of

5   his claim which would entitle [the plaintiff] to relief'").[10]   "[W]hen the allegations in a

6   complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency

7   should . . . be exposed at the point of minimum expenditure of time and money by the parties

8   and the court." Id. (citations omitted).

9   Dismissal is warranted where the complaint lacks a cognizable legal theory.

10   Robertson v. Dean Witter Reynolds, Inc.,749 F.2d 530, 534 (9th Cir. 1984); *see* Neitzke v.

11   Williams, 490 U.S. 319, 326 (1989) ("Rule 12(b)(6) authorizes a court to dismiss a claim on

12   the basis of a dispositive issue of law").  Alternatively, a complaint may be dismissed where

13   it presents a cognizable legal theory yet fails to plead essential facts under that theory.

14   Robertson, 749 F.2d at 534; *see* Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th

15   Cir. 1988).  When a Rule 12(b)(6) motion is granted, leave to amend is ordinarily denied only

16   when it is clear that the deficiencies of the complaint cannot be cured by amendment.

17   DeSoto v. Yellow Freight Sys., Inc., 957 F.2d 655, 658 (9th Cir. 1992).

18   In reviewing Rule 12(b)(6) motions, the court must assume the truth of all factual

19   allegations and must construe them in the light most favorable to the nonmoving party,

20   including all ***reasonable*** inferences to be drawn from the facts alleged. Cahill v. Liberty Mut.

21   Ins. Co., 80 F.3d 336, 337-38 (9th Cir. 1996).  However, legal conclusions need not be taken

22   as true merely because they are cast in the form of factual allegations.   Roberts v.

23   Corrothers, 812 F.2d 1173, 1177 (9th Cir. 1987); Western Mining Council v. Watt, 643 F.2d

24   618, 624 (9th Cir. 1981); *see also* Transphase Systems, Inc. v. Southern California Edison

25

26   [10]   Conley's "no set of facts" language "has earned its retirement. The phrase is best
27   forgotten as an incomplete, negative gloss on an accepted pleading standard:  once a claim has
   been stated adequately, it may be supported **by showing** any set of facts consistent with the
   allegations in the complaint." Bell Atlantic, 127 S.Ct. at 1969 (emphasis added). "It is not . . . proper
28   to assume that [the plaintiff] can prove facts that it has not alleged or that the defendants have
   violated the [laws] in ways that have not been alleged." Id. at 1969 n.8 (citation omitted).

1   Co., 839 F.Supp. 711, 718 (C.D. Cal. 1993) (the court does not "need to accept as true

2   conclusory allegations . . . or unreasonable inference") (citation omitted).

3                    **2.    Evidentiary Objections**

4         Defendants object to Wang's reliance on the Declaration of his wife, Dr. Ying Zeng,

5   in support of his Oppositions to Defendants' Motions, on grounds:  she addresses issues

6   beyond the arguments presented in the Motions; Rule 12(b)(6) review standards restrict the

7   court to consideration of the adequacy of the pleading without resort to extrinsic evidence;

8   and on the basis of specific evidentiary objections to various statements contained in her

9   declaration.  If the court considers facts or evidence outside the complaint, documents relied

10  on in the complaint, and matters of which it may take judicial notice, the Rule 12(b)(6) motion

11  will be converted into a Rule 56 motion for summary judgment.  Rule 12(b).[11]   The court

12  accordingly disregards the Declaration of Wang's wife in connection with its review of the

13  Rule 12(b)(6) motions and applies only the latter standards.[12]  Defendants' Objections to

14  consideration of the Declaration are **SUSTAINED** to that extent.

15                    **3.    Litigation Privilege:  Section 47(b)**

16        The Fallbrook Defendants argue all seven of Wang's causes of action arise from Dr.

17  Kline-Barnett's placing of a telephone call from the Fallbrook Hospital emergency department

18  to the San Diego County Sheriff's Department requesting assistance after Wang arrived in

19  the emergency room under the influence of alcohol and became disruptive.  "Officers from

20  the Sheriff's Department quickly arrived at the emergency room and placed Plaintiff under

21  arrest after observing his behavior.  Plaintiff was then taken to the County jail."  Fallbrook

22  Mot. 3:12-18.  They argue all Wang's claims for relief are predicated on those few "pertinent

23  facts," and all  his claims are accordingly barred by the litigation privilege set forth in CAL.

24

25        [11]   Rule 12(b) provides, in pertinent part:  "If, on a motion asserting the defense numbered
     (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters
26   outside the pleading are presented to and not excluded by the court, the motion shall be treated as
     one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given
27   reasonable opportunity to present all material made pertinent to such a motion by Rule 56."

28        [12]   The court may, however, consider supporting and opposing affidavits in connection with
     deciding an anti-SLAPP motion.  *See infra.*

CIV. CODE § 47(b) ("Section 47(b)").  PCCMA also argues "none of these communications can constitute the basis for any of the tort actions alleged by plaintiff."  PCCMA Mot. 5:17-20.

> Although Plaintiff goes on for page after page with accusations of patient dumping, discrimination because of ethnicity, etc., the bottom line is that the FAC or its predecessor would not have been filed had the emergency room personnel not called the police.  *All* of Plaintiff's causes of action should be dismissed as barred by the litigation privilege.

Fallbrook Mot. 5:10-14.

A "privileged publication or broadcast" is one made ". . . (b) In any (1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law . . . ," with enumerated exceptions not applicable in these circumstances. Section 47(b).  *See* Hagberg v. California Federal Bank, 32 Cal.4th 39, 7 Cal.Rptr.3d 803 (2004); Shaddox v. Bertani, 110 Cal.App.4th 1406 (2003).  If a complaint on its face alleges facts revealing an affirmative defense of absolute privilege, a court can properly find failure to state a claim.  *See* Easton v. Sutter Coast Hospital, 80 Cal.App.4th 485, 490 (2000) (affirming dismissal on demurrer). "[S]ection 47(b) operates to bar civil liability for any tort claim based upon a privileged communication, with the exception of malicious prosecution. . . ." Hagberg, 7 Cal.Rptr.3d at 821, *citing* Silberg v. Anderson, 50 Cal.3d 205, 215-16 (1990).  Section 47(b) "applies to complaints to governmental agencies requesting that the agency investigate or remedy wrongdoing." Id. at 811 (citations omitted).  A report of suspected violations of criminal law and contacts with law enforcement personnel requesting they respond are communications that "also enjoys an unqualified privilege under section 47(b)." Id. at 812, 817 (the privilege applies to a " 'communication to an official agency, which is designed to prompt action,' including a communication to the police that is intended to trigger an investigation into possible criminal activity") (citation omitted); *see also* Shaddox, 110 Cal.App.4th at 1415 (a dentist's communication with a police officer patient's departmental superiors to report a suspicion the patient had a prescription drug problem, leading to an internal investigation and officer discipline for "improper conduct," was protected by the litigation privilege of Section 47(b) and not actionable as a violation of medical privacy laws).

1    The litigation privilege of Section 47(b) applies only to communicative acts, not
2  tortious courses of conduct. Buchanan v. Maxfield Enterprises, Inc., 130 Cal.App.4th 418,
3  421 (2005) (reversing a trial court's holding Section 47(b) barred plaintiffs claims for invasion
4  of privacy and false imprisonment arising from a security guard's arrest for plaintiff's refusal
5  to leave a store, finding the defendants' actions were conduct rather than protected
6  communicative acts, distinguishing Hagberg). "The purpose behind the policy is 'to assure
7  utmost freedom of communications between citizens and public authorities whose
8  responsibility it is to investigate and remedy wrongdoing . . . ,' thereby freeing citizens from
9  the threat of litigation." Shaddox, 110 Cal.App.4th at 1415-16 (citations omitted); Buchanan,
10 130 Cal.App.4th at 423; Williams v. Taylor, 129 Cal.App.3d 745, 753 (1982) ("a
11 communication concerning possible wrongdoing, made to an official government agency
12 such as a local police department, and which communication is designed to prompt action
13 by that entity, is as much a part of an 'official proceeding' as a communication made after
14 an official investigation").    Even false reports to police are absolutely privileged
15 communications under Section 47(b). *See* Hagberg, 7 Cal.Rptr.3d at 820-21.

16    In Hagberg, a bank teller reported to her supervisor she suspected from its
17 appearance a Smith Barney check presented for cashing by a Hispanic customer might be
18 counterfeit.  The supervisor agreed, called Smith Barney, was informed the check was not
19 valid, then contacted the bank's corporate security officer.  The security officer instructed the
20 supervisor to call the police to report an attempt to negotiate a counterfeit check.  In the
21 meantime, the security officer called Smith Barney. He was informed the check was actually
22 valid, and the earlier information to the contrary was mistaken.  The supervisor was still on
23 the telephone with police.  She interrupted her statement to the dispatcher to say the bank
24 no longer needed police assistance.  The dispatcher told her the police were already at the
25 bank and the supervisor should tell them to leave.  The supervisor walked over to the teller
26 window as an officer approached Hagberg and told him the bank had cancelled its call.  The
27 police nevertheless proceeded with their investigation, detained the customer, searched her
28 person and handbag, and arrested her.  She was released 20 minutes later.

1    The Hagberg court concluded the Section 47(b) privilege barred the woman's
2 complaint against the bank for race discrimination in violation of the Unruh Civil Rights Act,
3 false arrest, false imprisonment, slander, invasion of privacy, intentional infliction of
4 emotional distress, and negligence because the bank's statements to the police concerned
5 suspected criminal activity the police were solicited to investigate.  Section 47(b) "establishes
6 a privilege that bars liability in tort [excepting only malicious prosecution] for the making of
7 certain statements," and "bars a civil action for damages for communications made."
8 Hagberg. 7 Cal.Rptr.3d at 808; *see also* Brown v. Department of Corrections, 132
9 Cal.App.4th 520, 529-30 (2005) (applying Hagberg  to conclude a report to police of an
10 employee's threats of violence against his supervisors constituted "statements, reports and
11 actions regarding . . . apparent criminal threats of violence" was a communicative act
12 absolutely privileged under section 47(b), so plaintiff could not "maintain an action against
13 the defendants based on those statements, reports and actions").

14    The court relies on Wang's factual pleading of his emergency room conduct as
15 triggered the call to police rather than his expansive and self-serving characterizations and
16 interpretations (which are at several crucial junctures incompatible with the facts he alleges).
17 Defendants' call to police was a communicative act.  Hagberg, 7 Cal.Rptr.3d at 808.  Wang's
18 assertion his conduct was peaceable is contradicted by such other FAC allegations as
19 Officer Schmidt's descriptions of Wang as argumentative and increasingly vocal, with arm-
20 waving and escalating agitation while resisting medical treatment.  Wang admits he was
21 uncooperative as a manifestation of purportedly normal "agitation" indicative of stress in the
22 presence of police.  He admits he was intoxicated when he was transported to Fallbrook.
23 He has pled Defendants' communications with police were designed to promote action, even
24 though he imputes to Defendants, in the most conclusory manner, improper motives such
25 as race discrimination and "patient dumping" for economic reasons as alternative
26 explanations for placing the call, even if law enforcement intervention was the objective.
27 CAL. PENAL CODE § 647(f) establishes as a misdemeanor "disorderly conduct" by persons
28 "found in any public place under the influence of intoxicating liquor . . . ."  Like the Hagberg

1  plaintiff, whose claims were dismissed, Wang was later released by the police without any

2  formal charge.

3      Wang's privacy violation allegations arise from Defendants' alleged sharing of his

4  medical information with police and permitting police to observe him in the emergency room

5  when they responded to the call.  However, the only "medical information" discernable from

6  the FAC Defendants could have disclosed appears to be as recorded in Officer Schmidt's

7  notes, *i.e.* "Albert Wang was transported via ambulance to the hospital as a result of severe

8  alcohol intoxication."  FAC ¶ 167.  Wang's medical negligence allegations inform the viability

9  of his release of confidential information claim.  He alleges Defendants failed to treat him

10 and failed to develop his medical history.[13]  He identifies no particular "confidential *medical*

11 information" revealed to the law enforcement officers.  As discernable from the FAC,

12 Defendants' communication was limited to the information Wang had been brought by

13 ambulance to the emergency room while intoxicated and was behaving disruptively.

14     Based on a close parsing of the FAC allegations, the court finds Wang's claims for

15 relief predicated on the emergency room telephone call to the police and their subsequent

16 investigation and arrest must be dismissed with prejudice because that communication is

17 protected by the absolute privilege of Section 47(b).  Even if Defendants' report to the police

18 that led to Wang's arrest contained false information, applying Hagberg, Wang cannot

19 prevail on any of his tort claims arising from that communication.  Wang alleges responding

20 police officers observed him in the emergency room, and Officer Schmidt saw Wang became

21 increasingly argumentative.  Accordingly, based on his own allegations, the police arrested

22 Wang after personally confirming his conduct warranted taking him into custody from where

23 he was creating a disturbance.  Wang's representations to the contrary are internally

24 inconsistent with the factual allegations of the FAC considered in its entirety.  Accordingly,

25 the court **GRANTS** the motions to dismiss to the extent Wang's causes of action are

26 predicated on Defendants' telephone call to police and law enforcement's arrival, presence,

27

28      [13]  However, as discussed below, emergency room protocols generally require only that
personnel respond to acute symptoms and intervene to stabilize, not necessarily to treat or diagnose.

observations, and arrest after their investigative observations.  However, the Section 47(b) privilege defense does not entirely dispose of all the FAC allegations.  Some conduct separate from the communicative act of calling police and its direct aftermath is also alleged, and the court therefore examines the causes of action separately to the extent they survive the affirmative defense.

### 4.   Assault And Battery Claims

"Harmful or offensive contact, intentionally done, is the essence of battery. . . , while apprehension of that contact is the basis of assault," when they occur without consent and cause injury.  Witkin, *Summary of California Law*, 10th Ed. 2005, Vol. 5, Torts ("Witkin") § 387; *see* California Civil Jury Instructions ("CACI") Nos. 1300, 1301.  Defendants would have the court construe the FAC as alleging as the sole source of Wang's apprehension of harmful or offensive contact the telephone call to police and the subsequent arrival of police who stayed in Wang's vicinity in the emergency room.  From that perspective, Section 47(b) would extend the litigation privilege to the tort of assault.  Similarly, to the extent the battery claim may be construed as arising from his physical arrest by police, Section 47(b) precludes the claim because Defendants' contribution to that result was communicative (*i.e.*, the telephonic report placing in motion the events resulting in Want's arrest), and Defendants were not themselves effectuating some kind of citizen's arrest which could be construed as conduct unprotected by the litigation privilege.  *Cf.* Wang v. Hartunian, 111 Cal.App.4th 744 (2003).[14]  Similarly, to the extent Wang's assault and battery claims involve any touching *by police* or apprehension of physical contact *with police*, any such theory of liability extending to the named Defendants is barred by Section 47(b).  Accordingly, to the extent these claims

---

[14]   As summarized in Buchanan, 130 Cal.App.4th at 424, the Wang v. Hartunian case involved a dispute between neighbors that led to Hartunian obtaining a restraining order against Wang.  When Hartunian observed Wang standing at the property line threatening and yelling at him in violation of the restraining order, Hartunian called police to report the incident.  The police asked if Hartunian wanted to make a citizen's arrest.  He signed a "Private Person's Arrest" form.  The police arrested and detained Wang pursuant to that form, so that Hartunian essentially effectuated the arrest rather than the police.  "[H]ad Hartunian summoned the police, and reported to them Wang's conduct with the intention of promoting his arrest, and had the police, after conducting an investigation based on that report, arrested Wang, Hartunian's conduct of making a report to the police might fall within the ambit of Civil Code section 47, subdivision (b)."  Wang, 111 Cal.App.4th at 749.  In this case, Defendants behaved in a manner consistent with the latter conduct.

are predicated on the telephone call and subsequent police investigation, the Motions are **GRANTED**.

The PCCMA Defendants argue, in addition to the litigation privilege of Section 47(b), Wang's assault and battery causes of action fail to state a claim. PCCMA Mot. 6:4-6. Wang alleges as a source of apprehension hospital personnel failed to explain intended procedures before they attempted to examine and treat him. From that perspective, the assault and battery claims can be construed as not arising from the privileged communication to police.

While a surgical operation or other medical procedure performed without the patient's consent is a battery, a competent adult's consent to the procedure eliminates any cause of action for battery when it is performed within the scope of the consent. Witkin, Summary of California Law, 10th ed., 5 Torts § 388. Wang's FAC allegations from time to time imply he did not voluntarily go to the emergency room and therefore did not consent to any contact, despite an apparent incompatibility of such a theory with essential elements of other of his claims, and despite his contentions Defendants should have administered multiple tests he identifies with particularity that would have involved physical contact.

Wang alleges he presented at the emergency room transported by paramedics at Wang's wife's instruction. His wife's assumption of that decision and Wang's admitted intoxication suggest his own competency to give informed consent was impaired at the time. Moreover, Wang invokes Defendants' alleged affirmative duty "to safeguard[] patients from danger due to mental incapacity," extending expressly "to those patients [like himself] who are being treated for alcohol-related medical conditions," an implicit acknowledgment of their justification for touching him. FAC ¶ 541. Nevertheless, his assault claim alleges Kline-Barnett, Butler, and Dunn intentionally caused him "to be under apprehension of harmful or offensive contact," he was "aware of the threatened contact," he "believed that **if he did not take action**, a harmful or offensive contact would occur in the near future," and he "did not

1    consent" to Defendants' conduct.[15]    FAC ¶¶ 444-451 (emphasis added).  He alleges he was

2    "harmed," their conduct was a "substantial factor" causing his harm, they acted "with a willful

3    and conscious disregard of [his] rights and safety," and the conduct was "outrageous,

4    oppressive, despicable and malicious."  FAC ¶¶ 452-455.  That type of pleading epitomizes

5    the <u>Bell Atlantic</u> admonition that a claim for relief is not stated by a mere "formulaic recitation

6    of the elements of a cause of action," and that "some threshold of plausibility must be

7    crossed at the outset" to avoid dismissal.  <u>Bell Atlantic</u>, 127 S.Ct. at 1965-66.

8         Wang's battery cause of action summarily alleges Kline-Barnett, Butler, and Dunn

9    "intentionally inflicted [unspecified] harmful and offensive bodily contact on Plaintiff."  FAC

10   ¶¶ 432-434.  He summarily alleges he did not consent to the bodily contact, the "contact was

11   damaging to a reasonable sense of dignity," and "Plaintiff was harmed."  FAC ¶¶ 435-437.

12   He does allege:  "Plaintiff had puncture wound at the time of his discharge from Fallbrook

13   Hospital," whereas he "did not have any puncture wou[n]d at the time of his admission to

14   Fallbrook Hospital," inferring a battery by Defendants inflicted the wound, without expressly

15   alleging supporting facts.  FAC ¶ 438.  His allusion to a puncture he incurred at the hospital

16   is unsupported by any facts showing how the wound occurred or who in particular may have

17   intentionally wounded him.[16]    He contends Defendants' conduct:  was in "willful and

18   conscious disregard of Plaintiff's rights and safety;" subjected him "to pain, suffering,

19   embarrassment, humiliation and indignity;" "was a substantial factor in causing Plaintiff's

20   harm;" and was "outrageous, oppressive, despicable and malicious."  FAC ¶¶ 439-442.

21        The PCCMA Defendants argue the FAC "wholly fails to allege when or how Dr. Kline-

22   Barnett, or any of the Fallbrook Hospital personnel, used, or threatened to use, force against

23

24        [15]  The only "action" discernable from the FAC that Wang took was to waive his arms around
25   while resisting medical examination.  The court construes Wang's representation he believed he had
     to "take action" as substantiating his resistence to Defendants' attempted medical ministrations

26        [16]  Wang alleges no more than that in the course of someone attempting to examine him in
     the emergency room, while he admittedly waved his arms around, he incurred a puncture injury
27   somewhere on his body in some unspecified way.  He seeks no separate damages for any purported
     wound.  Based on the vague FAC allegations, that injury can only be construed as accidental, *de
28   minimus*, and ancillary.  His pleading of a physical injury also disposes of his contention Defendants
     fraudulently billed his insurance company by referring to a wound.

plaintiff to substantiate claims of battery and assault." PCCMA Mot. 5:25-27.  They assert the FAC lacks any facts or reasonable inferences that can support the essential element of *intentional* conduct to either inflict harmful and offensive bodily contact on Wang (battery) or cause him to be under the apprehension of such harmful or offensive contact (assault) on the part of the named defendants.  PCCMA Mot. 5:27-6:3.  The court concurs.  Wang fails to plead any facts to establish an *intent* on the part of Defendants to touch him *in a harmful or offensive manner* in the process of administering a medical procedure, or some other particular physical contact he should have been able to articulate, inasmuch as he contends he was conscious at all times in the hospital.

The gravamen of his FAC on the medical issues is that he did not receive the treatment or procedures he contends he should have received, or any treatment at all, in the brief time he was at Fallbrook.  He has alleged no facts whatsoever from which any reasonable jury could infer the emergency room personal threatened or intended to cause him physical harm during their ministrations or attempted ministrations.[17]

Wang's pleading of the assault and battery causes of action is devoid of factual specificity adequate to save them from dismissal for failure to state a claim. Each claim either presents a cognizable legal theory with a failure to plead essential facts under the theory or arises from conduct absolutely privileged under Section 47(b), or both.  *See* Robertson, 749 F.2d at 534; Balistreri, 901 F.2d at 699; Hagberg, 7 Cal.Rptr.3d at 803. Accordingly, the Rule 12(b)(6) Motions to dismiss those claims are **GRANTED**.

### 5.    False Imprisonment Claim

" '[T]he tort of false imprisonment is the nonconsensual, intentional confinement of a person, without lawful privilege, for an appreciable length of time . . . .'  A person is falsely imprisoned 'if he is wrongfully deprived of his freedom to leave a particular place by the *conduct* of another.' "  Hagberg, 7 Cal.Rptr.3d at 819 (emphasis added), *quoting* Molko v.

---

[17]  Moreover, to the extent Wang's presentation at the hospital emergency room is construed as an "emergency situation occurring in a hospital," CAL. BUS. & PROF. CODE § 2397 authorizes the defendant health care providers, without liability for civil damages for resulting injury, to perform emergency evaluations or procedures without obtaining informed consent from the patient.

Holy Spirit Assn., 46 Cal.3d 1092, 1123 (1988); see also Blaxland v. Commonwealth Director of Public Prosecutions, 323 F.3d 1198, 1205 (9th Cir. 2003) (to state a claim for false imprisonment, plaintiff must allege:  (1) non-consensual (2) intentional confinement (3) without lawful privilege, and (4) for an appreciable period of time).  The "appreciable period of time" element can be satisfied by even a brief detention.  Easton, 80 Cal.App.4th at 496.

Wang alleges in his Third Claim Kline-Barnett, Butler, and Dunn "held [him] within Fallbrook Hospital's emergency room against his will **after** Fallbrook Hospital's personnel called the police."  FAC ¶¶ 458-463 (emphasis added).   From the FAC timing allegations, that period could not have exceeded about five minutes between the call to police and their arrival.  Conduct after the police arrived would fall within the Section 47(b) privilege.  Wang summarily describes:  "Fallbrook Hospital's personnel asserted that they had authority to confine Plaintiff," they participated and assisted the police in the warrantless, unlawful arrest of Plaintiff in the emergency room," and their conduct was "a substantial factor causing [his] harm" and resulting "in the deprivation of Plaintiff's liberty," "mental suffering, humiliation, loss of time, inconvenience, etc."  FAC ¶¶ 465-472 (emphasis added).  Wang alleges his wife "wanted to take him home after realizing that Fallbrook Hospital was not going to give Plaintiff the CT scan and other medical diagnostic exams for which he was sent to the hospital."[18]   FAC ¶ 464.   He summarily alleges Defendants acted "with a willful and conscious disregard of [his] rights and safety," conduct allegedly "outrageous, oppressive, despicable and malicious."  FAC ¶¶ 466-472.

As discussed above, the communication to police and subsequent police response can give rise to no tort liability against these Defendants on any of Wang's tort theories, including false imprisonment.  Section 47(b).  "If a complaint on its face alleges facts amounting to an affirmative defense of absolute privilege," it fails to state a claim.  Easton, 80 Cal.App.4th at 490.  A request for public safety intervention, even if mistaken, is protected

---

[18]   The court notes Wang was not "sent to the hospital" for any particular test binding on Fallbrook to perform.  Emergency medical personnel are bound to provide stabilizing treatment, as Wang's own definition of "patient dumping" and citation to statutory authority such as the EMTALA addressing those obligations confirm.

06CV1478

communication.  As in <u>Hagberg</u>, once the police were called, the reporting party could not control their investigation or the outcome.  *See* <u>Mulder v. Pilot Air Freight</u>, 32 Cal.4th 384 (2004) (applying <u>Hagberg</u> to find Section 47(b) barred plaintiff's false imprisonment claim arising from defendants' report to police that plaintiff had stolen their flight recorder, as a privileged communication concerning possible wrongdoing).  It was *the police* who compelled Wang to go to jail against his will.  To the extent Wang may intend to allege *false arrest*, he has not named a defendant who may be held accountable for such a tort, as none of these Defendants effectuated the actual arrest.

Finally, to prevail on a false imprisonment claim, the plaintiff must allege at least nominal harm from the restraint or confinement by these Defendants (as opposed to police).  Wang does not do so.  He actually alleges, in support of his medical negligence claim, Defendants should have kept him at Fallbrook much longer than they did.[19]  Legal conclusions cast in the form of factual allegations need not be taken as true when deciding a Rule 12(b)(6) motion, and the court declines to convert Wang's conclusory characterization of "intentional confinement. . . against his will" into factual allegations for purposes of defeating these motions.  <u>Roberts</u>, 812 F.2d at 1177; <u>Western Mining Council</u>, 643 F.2d at 624.  For the foregoing reasons, the Motions to dismiss his False Imprisonment cause of action are **<u>GRANTED</u>** for failure to state a claim upon which relief can be granted.

### 6.   <u>Public Disclosure Of Private Facts</u>

Wang first relies for his Fourth Cause of Action on Officer Schmidt's purported statement in his arrest report that "he received a radio call to investigate at Fallbrook Hospital, and that hospital staff informed him that Plaintiff was transported via ambulance to Fallbrook Hospital."  FAC ¶ 475.  Wang characterizes the *radio call* as susceptible of

---

[19]  Wang's argument that he has adequately alleged "Fallbrook Hospital's personnel held him against his will, asserted their authority to confine Plaintiff" as sufficient to state a false imprisonment claim (along with their alleged assistance in the "unlawful arrest") (Anit-SLAPP Mot. Opp. 9:25-26) is entirely incompatible with his medical negligence contentions that Defendants did not do enough for him.  "Because of his physical appearance, Fallbrook Hospital's medical personnel assumed that Plaintiff was uninsured and could not afford to pay for the hospital's medical services.  As a result, **Fallbrook Hospital's medical personnel did not perform the requisite diagnostic tests to rule out the possibility of life-threatening conditions (TIA and CVA) identified by the paramedics, and did not keep Plaintiff in the hospital's observation unit so that he could receive close medical supervision for 24 to 48 hours.**"  Opp. 1:26-2:5, *citing* ¶¶ FAC 61, 65 (emphasis added).

reception "by numerous police officers as well as public at large," although it is not clear from his allegations his personal identity was actually transmitted, he does not allege any such "interception" actually occurred and, in any event,  the content of Defendants' *telephone call* to police is protected by the Section 47(b) privilege, as would be communications to police after they arrived at Fallbrook to investigate.  FAC ¶ 476.

Next, he alleges defendants Kline-Barnette, Butler, and Dunn "publicized private information concerning Plaintiff" by allowing "the police officers to enter and remain in the emergency room of Fallbrook Hospital, and to make first-hand observations of Plaintiff, a patient in the hospital for medical treatment."  FAC ¶¶ 477-478.  Wang characterizes the call and the police investigation as a publication of "private information concerning Plaintiff" and as an infringement of his "medical privacy rights" in a "highly offensive" manner.  FAC ¶¶ 478-481.  However, he does not allege Defendants possessed or developed protectable medical information beyond Wang's name and the reason he presented at the emergency room, a reason inextricably intertwined with his manifestations there of public intoxication triggering the call and for which police ultimately arrested him.  On the contrary, he alleges the Defendants wrongfully made no medical record and performed no adequate examination as part of his allegations they should have performed particular diagnostic tests, and should have observed him for 24 to 48 hours before discharging him.

Leaving aside the inconsistency of his allegations he was "a patient in the hospital for medical treatment" and his allegations he did not consent to be there or to receive medical treatment, the Section 47(b) privilege again bars the claim.  His allegations permit no reasonable inference other than that the "confidential medical information" Defendants allegedly revealed to the third-party police was confined to a description of his presenting at the hospital in an intoxicated condition, apparently the only data they had.  Statements to police in such circumstances are absolutely privileged.  *See* Hagberg, 7 Cal.Rptr.3d at 803.  Accordingly, the Motion is **GRANTED** with respect to the Fourth Claim.

### 7.   Violations Of Constitutional Right To Privacy

Wang relies for his Fifth Claim on the California Constitution, Article I, Section 1:  "[all] people are by nature free and independent and have inalienable rights.  Among these are

1  . . . pursuing and obtaining safety, happiness and privacy." FAC ¶ 488.  He contends the

2  "zone of privacy" created by that section "extends to the details of one's medical history."

3  FAC ¶ 489.  As noted above, Wang does not identify what details of his "medical history"

4  Defendants developed or elicited from him that they purportedly improperly revealed.  None

5  of his allegations permits the inference Fallbrook personnel had or revealed any information

6  other than that Wang presented at the emergency room associated with a bout of

7  intoxication and was behaving disruptively.  To the extent Wang pleads Defendants released

8  his "medical history" in connection with their summoning of police, he fails to state a claim

9  because the communication to police was absolutely privileged under Section 47(b).

10  Wang's further allegation that "[b]y seeking emergency care," he did not " 'open the

11  door' for persons without any clearly identifiable and justifiable official reason who may wish

12  to enter the treatment room in the Emergency Department of Fallbrook Hospital, where the

13  medical aid is being administered" must also fail because police presence was associated

14  with an investigation triggered by Defendants' privileged report of Wang's conduct and

15  request for investigation, a "clearly identifiable and justifiable official reason" for police

16  presence in the emergency room.  FAC ¶ 493.  Wang contends he was a patient who went

17  "into a hospital to be examined/treated" and recites various statutory prerequisites for

18  release of patient medical history or records, but alleges no facts regarding what confidential

19  patient information Defendants obtained during the 15 minutes of his uncooperative

20  presence in the emergency room, especially since he alleges they performed no significant

21  medical examination and they failed to develop a patient record.  FAC ¶¶ 495-499.

22  To advance his privacy violation theories, Wang argues the emergency room "is not

23  a public place."  FAC ¶¶ 352-358, 361. "By having Plaintiff arrested pursuant to California

24  Penal Code Section 647(f) and failing to apologize for their misconduct, Defendants are

25  asserting that Fallbrook Hospital's emergency room is a 'public place.'"  FAC ¶ 355.  He

26  challenges the premise on which Fallbrook "called the police to have Plaintiff falsely arrested

27  . . . from the emergency room for being drunk in a 'public place,'" a misdemeanor under CAL.

28  PENAL CODE § 647(f).  FAC ¶¶ 352-358.

06CV1478

1
2
3
4
5

> If Fallbrook Hospital is allowed to unreasonably call the police to arrest its patients from its emergency room with impunity, the chilling effect would be detrimental to our healthcare system. The general public would not have confidence in going to hospitals if Fallbrook Hospital successfully establishes the precedent that its emergency room is a "*public place*" and that a hospital is entitled to call the police to arrest a patient who drank some red wine at his own home, became intoxicated, and went to the hospital for emergent [*sic*] medical care.

6   FAC ¶ 361.

7       The court rejects Wang's argument a hospital emergency room is not a public place.

8   Wang's Unruh Act claim implicitly acknowledges the contrary. *See infra*.

9       In summary, Wang's allegations do not permit any reasonable inference these

10  Defendants were in possession of medical information collected in the course of any

11  treatment, as he resisted examination or treatment during his 15-minutes in the emergency

12  room.  The only information that may reasonably be extracted from the FAC allegations

13  regarding disclosures were the phone call reporting intoxication-related misconduct to police.

14  To the extent Defendants communicated that information to police, it was done within the

15  context of the Section 47(b) privilege. The police made their own observations of Wang's

16  demeanor when they responded to investigate and decided to arrest him.  Accordingly, the

17  Motions to dismiss Wang' Fifth Claim are **GRANTED**.

18              **8.    Medical Negligence**

19      To prevail on his medical negligence claim, Wang would have to show breach of a

20  duty of care to provide adequate medical treatment, and damages caused by that failure.

21  Galvez v. Frields, 88 Cal.App.4th 1410, 1420 (2001) (plaintiffs in medical malpractice cases

22  must establish:  (1) duty of the professional to use such skill, prudence and diligence as

23  other members of the profession commonly possess and exercise; (2) a breach of that duty;

24  (3) a proximate **causal connection** between the negligent conduct and the resulting injury;

25  and (4) actual loss or damage resulting from the professional negligence).

26      Leaving aside the inconsistency of Wang's assault and battery claim allegations that

27  he did not consent to be touched or treated by emergency room personnel, Wang

28  incorporates and reasserts his allegations that he "was a patient in the emergency room of

Fallbrook Hospital and was under the care of Fallbrook Hospital's emergency medical

1   personnel," the emergency room personnel "abandoned" their patient without giving him

2   "enough notice before withdrawing from Plaintiff's care," were "negligent in failing to use the

3   level of skill, knowledge and care in diagnosis and treatment," and he should have received

4   "needed medical care."[20]  FAC ¶¶ 528-541,362. He thus claims negligent omissions.

5   Defendants argue the FAC fails to allege the required element of injury as a result of any

6   failure to perform the medical testing and observation Wang contends was negligently

7   withheld.  Nowhere in the FAC does Wang contend he actually has or had TIA or CVA

8   conditions, let alone that such conditions were exacerbated by Defendants' purportedly

9   negligent omissions.  He alleges he had been treating a high cholesterol condition for years,

10  but again his pleading links no harm to his person or any deterioration of a medical condition

11  resulting from Defendants' omissions during his approximate 15-minute presence at

12  Fallbrook.  Moreover, the details he alleges regarding what should have been done are the

13  province of experts to articulate, and are entitled to no consideration in making this ruling.[21]

14       The only repercussions Wang alleges from the incident arise from the psychologically

15  "traumatic experience" of the arrest.  *See* FAC ¶¶ 387-388.   The only reasonable

16  construction of "this horrible, traumatic experience" as pled is a reference to his removal by

17  _____

18  [20]    Wang acknowledges he was transported to Fallbrook on his wife instructions to
    paramedics.  In stating his allegations of fraudulent insurance billing and economically-motivated
19  "patient dumping," Wang pleads: "Indeed, on Saturday afternoon, July 30, 2005, Plaintiff **was only
    allowed to stay in the emergency room** of Fallbrook Hospital from approximately 3:50 p.m. to 4:10
20  p.m. (just 20 minutes), or less than 0.02 adjusted day," inferring he should have been held longer.
    FAC ¶ 303 (emphasis added).  He alleges as medical negligence Defendants' failure to hold him at
21  the hospital for one to two days for observation, while simultaneously alleging Barnett-Kline, Butler,
    and Dunn intentionally "inflicted confinement on Plaintiff" by holding him "within Fallbrook Hospital's
22  emergency room against his will after Fallbrook Hospital's personnel called the police." FAC ¶¶ 458-
    463. "As factual support for his claim for negligence, Plaintiff alleged that Defendants did not actually
23  make any necessary medical evaluation to determine whether it was medically safe to discharge
    Plaintiff from the hospital, did not perform any CT scan or 12-led EKG to rule out the possibility of
24  TIA and CVA for which Plaintiff was taken to the hospital in an ambulance, did not give Plaintiff a
    thorough physical and neurological examinations [*sic*] did not keep Plaintiff in the observation unit
25  of the hospital for close medical supervision for 24 to 48 hours.  Such allegations independently
    support a cause of action for medical negligence." Anit-SLAPP Mot. Opp. 10:3-9.

26  [21]    He contends when a patient like himself who "is suffering from altered level of
    consciousness, and where there is [a] suspicion of substance abuse as a contributing factor, a
27  reasonable, competent physician should intravenously administer thiamine, 100mg; dextrose, 50%,
    50 cc IV; and naloxone, 0.4 to 2.0 mg IV," as well as performing "a thorough physical examination
28  and neurological examination, order blood chemistry tests, and obtain an emergent head CT scan
    as the first test after initial stabilization." FAC ¶ 69.  Any post-stabilization activity would appear to
    be beyond the province and duty of *emergency* medical personnel.

1  law enforcement from the emergency room on suspicion of public intoxication.[22]  The court

2  finds the FAC fails to state a claim for medical negligence.  Accordingly, Defendants' Motions

3  to dismiss the medical negligence claim are **GRANTED**.

**9.    Violation of California Unruh Civil Rights Act**

5       Wang speculates one explanation for Defendants' allegedly "dumping" him is racial

6  or ethnic discrimination against him as a person of Chinese ancestry.  He alleges as his

7  Seventh Claim violation of California's Unruh Civil Rights Act ("Unruh Act"), CAL. CIV. CODE

8  §§ 51, *et seq.,*"an enactment that provides for equal 'accommodations, advantages, facilities,

9  privileges, or services in all business establishments' without regard to characteristics such

10 as race, ancestry, or place of national origin." Hagberg, 7 Cal.Rptr.3d at 822, *quoting* CAL.

11 CIV. CODE § 51(b).  "[A] plaintiff seeking to establish a case under the Unruh Act **must plead**

12 **and prove intentional discrimination *in public accommodations*** in violation of the terms

13 of the Act." Harris v. Capital Growth investors XIV, 52 Cal.3d 1142, 1175 (1991) (emphasis

14 added).  Were the court to accept the FAC argument that a hospital emergency room is not

15 a "public place," on that basis alone his Unruh Act claim would fail as a matter of law.  The

16 court rejects the premise a for-profit emergency room where anyone can present themselves

17 for medical treatment is a "private" venue.

18      The FAC discusses at great length economic, demographic, and patient statistical

19 data purportedly associated with the entity defendants.  Wang draws conclusions in support

20 of his discrimination claims from his descriptions of those materials.  He does not attach as

21 FAC exhibits any of the documentation he alludes to as the basis for his opinions, nor does

22 he provide any foundation for his qualifications to interpret such data.  He alleges *not a*

23 *single **fact*** from which a reasonable inference could be drawn that the incident giving rise

24 to  this  litigation  entailed  any  racially-motivated  misconduct  cognizable  in  these

25

26 [22]    This construction of his pleading is confirmed by his argument in opposition to
   Defendants' motions to strike Wang's punitive damages claim: "Plaintiff hopes that such Defendants
27 will be made to remember, as a result of punitive damages, that they, as health care providers
   entrusted with patients' physical and mental wellbeing, **should not summarily call the police to**
28 **arrest an innocent patient, without warrant, from the emergency room**, because the **trauma of**
   **being arrested from a hospital** would have dire human consequence to its patient and his extended
   family, and put the patient in a much worse situation.  FAC ¶ 430." Opp. To Motion To Strike Punitive
   Damages 4:13-17.

1  circumstances, despite two stabs at pleading his claims, and despite (perhaps because of)

2  the extraordinary detail of his pleading.  In reviewing Rule 12(b)(6) motions, the court must

3  assume the truth of all factual allegations and must construe them in the light most favorable

4  to the nonmoving party, including all reasonable inferences to be drawn from those facts.

5  Cahill, 80 F.3d at 337-38.  However, the court is not at liberty to supply missing elements,

6  nor need legal conclusions be taken as true merely because they are cast in the form of

7  factual allegations.  Roberts, 812 F.2d at1177; Western Mining Council, 643 F.2d at 624.

8  In Hagberg, as here, the plaintiff alleged an Unruh Act violation arising from a

9  business entity's agents calling police to report suspected illegal activity by a person who

10  subsequently claims a motivation of racial or ethnic prejudice in the reporting.  The Hagberg

11  plaintiff argued on summary judgment that when the utterance of statements (*i.e.*,

12  communications with police about perceived wrongdoing) violates a statute such as the

13  Unruh Act, the statements should not be subject to an absolute privilege because of the

14  potential for abuse by citizens acting out of discrimination on the basis of race and other

15  protected classifications.  Hagberg, 7 Cal.Rptr.3d at 808.  The Hagberg court expressly did

16  not reach the broad legal question "whether proof that a business establishment has called

17  for police assistance (or has a policy of calling for police assistance) based on racial or

18  ethnic prejudice could give rise to liability under the Unruh Civil Rights Act notwithstanding

19  the provisions of section 47(b)."  Hagberg, 7 Cal.Rptr.3d at 822.  The only "policies" Wang

20  identifies substantiate the opposite of systematic racial or ethnic discrimination, as evident

21  from his FAC articulations of his allegations Defendants failed to provide the level of

22  attention and care to all patients promised in their promotional materials.

23  This court finds the question left open in Hagberg is not implicated here.  Wang

24  alleges no facts to support his characterization Defendants contacted police out of racial or

25  ethnic prejudice.  Any other motivation behind the call to the police is immaterial to a finding

26  of Section 47(b) privilege, even if the report were made in bad faith.  The privilege extends

27  even to invasion of privacy causes of action.  *See* Shaddox, 110 Cal.App.4th at 1418.

28  Leaving aside the telephone call to police and its aftermath, Wang alleges his is "a

case of patient dumping by Fallbrook Hospital and its emergency medical staff."  FAC ¶ 510.

1   However, the alleged motivation of economic discrimination is inextricably associated with

2   his attempt to plead racial or ethnic discrimination and dilutes any such inference.  Economic

3   considerations are not among the classifications (*e.g.*, race, sex, religion, etc.) or similar

4   characteristics listed in the Unruh Act.  *See* Harris, 52 Cal.3d at 1148.

> If Plaintiff were a Caucasian male accompanied by a wife who is Caucasian, Plaintiff would have been treated by Dr. Kline-Barnett and other staff at Fallbrook Hospital with more respect and attention, and would have been given more thorough medical examination and detailed diagnosis in light of the field impression of transient ischemic attack, TIA (435.9), and acute cerebrovascular disease, CVA (436), observed by the North County Fire Department's paramedics and noted in the Pre-Hospital Care Report.   [¶]   Fallbrook Hospital's personnel mistakenly assumed that Plaintiff was an uninsured patient and was not financially able to pay for the hospital's services.  [¶] **Plaintiff's ethnic background (Chinese Americans [*sic*]) and national origin** resulted in Defendants' **jumping to conclusion [*sic*] that Plaintiff *does not have the economic ability to pay*** for the needed medical services.

13  FAC ¶¶ 510-512 (emphasis added).

14         As discussed above, the FAC allegations substantiate Defendants called police to

15  investigate Wang's undisputed, observed, and reported intoxication and unruliness.  The call

16  was placed in circumstances entitling them to Section 47(b) protection from tort liability for

17  that communication, irrespective of Wang's attempt to paint it as an instance of "patient

18  dumping."  The FAC generalizes at great length regarding the alleged profit motives for

19  hospitals to engage in the practice to ensure admitted patients have the ability to pay for the

20  services rendered.   However, the court has found Wang fails to state a claim for medical

21  negligence, fails to allege any injury from the absence of testing he alleges in the abstract

22  would have been appropriate for diagnostic purposes associated with obligations applicable

23  to emergency room protocols, and lacks standing to pursue a patient dumping claim other

24  than as sustainable in the circumstances peculiar to his situation.

25         The FAC alleges Defendants were motivated to "dump" him based on stereotypical

26  assumptions *about his ability to pay for treatment* they purportedly deduced from the manner

27  of his dress when he presented in the emergency room, as opposed to a policy or practice

28  of not treating ethnic Chinese in the emergency room because of their race.  He only

obliquely  suggests  his  Unruh  Act  claim  may  devolve  from  disparate  application  of

1   Defendants' emergency room protocols based on his Chinese American race or ethnicity.

2   Wang's racial discrimination allegations describe no more than an ethnic stereotype, not a

3   potential civil rights violation.  *See* FAC §§ 173, 330-332, 362.  Reliance on a personality trait

4   perceived as reducing the risk of complaints about economic discrimination fails to support

5   a claim of racially-motivated discrimination.   Wang demonstrates his FAC has no such

6   foundation by his contentions elsewhere in the FAC he would have been considered a

7   *desirable patient* had the hospital confirmed his ability to pay for their services, an economic

8   decision not based on race.[23]   Wang also purports to extract from unsubstantiated CHS

9   filings with the U.S. Securities and Exchange Commission ("SEC") disclosures that Fallbrook

10  Hospital has been the subject of other allegations of *discrimination against uninsured*

11  *patients*, but he does not contend Fallbrook has been the subject of other allegations of

12  *racial or ethnic discrimination*.  FAC ¶¶ 376-381.  To the extent Wang could attempt to argue

13  his claim falls within the "broad legal question" the <u>Hagberg</u> court left open (*i.e.*, whether

14  communications otherwise privileged from tort liability under Section 47(b) can give rise to

15  liability under the Unruh Act if the business establishment called for police assistance or

16  which has a policy of calling for police assistance based on racial or ethnic prejudice), the

17  conclusory speculation he has alleged permits no reasonable inference Defendants called

18  police out of racial or ethnic prejudice against persons of Chinese ancestry rather than

19  because of the facts of Wang's intoxication and admittedly confrontational conduct.

20  Accordingly, the Motions to dismiss the Seventh Cause of Action are **GRANTED**,

21              **10.     Leave To Amend Denied**

22          Wang identifies himself as a practicing attorney representing himself in this matter.

23  He filed his FAC with the benefit of Defendants' prior briefing in support of their Motions to

24  dismiss the Complaint, expressly to expand his exposition of the elements of his claims and

25  _____

26  [23]    Wang expounds at length regarding the demographics of the Fallbrook area and the
    various forms of institutional "racial barriers to healthcare access" in general (intentional and
27  unintentional), alleging a disproportionate impact on ethnic minorities.  FAC ¶¶ 336-350.  He argues
    the risk of being arrested in the emergency room would discourage patients from going to hospitals
28  because "their impunity for their misconduct against Plaintiff would serve to reinforce *ethnic
    minorities' distrust* of our healthcare system." FAC ¶ 351, 427-430 (emphasis added).  He does not
    allege how such a fear would be more marked among racial minorities than any other group.

1   to supply additional facts and information.   FAC ¶¶ 10-12.   He has thus had two

2   opportunities to plead his claims.  The very lengthy FAC so thoroughly describes the conduct

3   and events during Wang's 15 minutes in the Fallbrook emergency room it is unimaginable

4   he has withheld any *facts* that could support the articulation of his causes of action.   In

5   order to cure the FAC defects he would have to contradict representations he has already

6   advanced in this litigation.  When the nature of the plaintiff's claim is clear, and deficiencies

7   in the statement of claims cannot be cured, a court properly denies leave to amend the

8   pleading.  Accordingly, leave to amend again is **DENIED**.

9               **B.    Anti-SLAPP Motions To Strike Complaint**

10         In addition to their Rule 12(b)(6) Motions To Dismiss, Defendants move to strike the

11   FAC as a SLAPP (*i.e.*, Strategic Litigation Against Public Participation).  "The anti-SLAPP

12   statute was enacted in 1992 for the purpose of providing an efficient procedural mechanism

13   to obtain an early and inexpensive dismissal of nonmeritorious claims 'arising from any act'

14   of the defendant 'in furtherance of the person's right of petition or free speech under the

15   United States or California Constitution in connection with a public issue . . . ." Martinez v.

16   Metabolife International, Inc., 113 Cal.App.4th 181, 186 (2003), *rev. den.* (Feb. 24, 2004),

17   *quoting* CAL. CODE CIV. P. § 425.16(b)(1) ("Section 425.16").  The statute allows courts to

18   strike any cause of action that arises from the exercise of constitutionally protected speech

19   and petition rights.  Flatley v. Mauro, 39 Cal.4th 299, 311-12 (2006) ("Section 425.16

20   therefore establishes a procedure where the trial court evaluates the merits of the lawsuit

21   using a summary-judgment-like procedure at an early stage of the litigation"); *see* Daimler-

22   Chrysler Motors Co. v. Lew Williams, Inc., 123 Cal.App.4th 344, 350 (2006) (Section 425.16

23   provides that a cause of action pursued to chill a defendant's First Amendment rights "shall

24   be subject to a special motion to strike, unless the court determines that the plaintiff has

25   established that there is a probability that the plaintiff will prevail on the claim"), *quoting*

26   Section 425.16(b)(1).  In contrast, Section 47(b) states a statutory privilege and limitation on

27   liability.  *See* Flatley, 39 Cal.4th 299 (discussing the interplay of the two).

28         In consideration of this court's ruling on the Motions To Dismiss, finding Wang has

      not stated his claims in a manner that survives Rule 12(b)(6) scrutiny, he has not

demonstrated a probability of prevailing on the merits of the claims, even had Defendants made a threshold showing the challenged causes of action arise from constitutionally protected activity. *See* Equilon Enterprises v. Consumer Cause, Inc., 29 Cal.4th 53, 66-67 (2002). Accordingly, the anti-SLAPP Motions are **DENIED AS MOOT**.

### C.   Motions To Strike Punitive Damages

Rule 12(f) provides, in pertinent part:  "Upon motion made by a party before responding to a pleading . . . or upon the court's own initiative at any time, the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Rule 12(f) provides for relief when a complaint seeks damages not recoverable as a matter of law.  *See* Wilkerson v Butler, 229 F.R.D. 166, 172 (E.D. Cal. 2005). Defendants move to strike Wang's punitive damages claim.  In consideration of the result with respect to Defendants' Motions To Dismiss, their Motions To Strike Punitive Damages are **DENIED AS MOOT**.

## III.   CONCLUSION AND ORDER

For all the foregoing reasons, **IT IS HEREBY ORDERED:**

1.   Defendants' Rule 12(b)(6) Motions are **GRANTED** as to all claims, with prejudice.

2.   Defendants' Anti-SLAPP Motions are **DENIED AS MOOT**.

3.   Defendants' Motions To Strike Punitive Damages are **DENIED AS MOOT.**

4.   The Clerk of Court shall terminate this action in its entirety.

**IT IS SO ORDERED**.

DATED:  June 7, 2007

**HONORABLE LARRY ALAN BURNS**
United States District Judge